UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO.   8:22-cr-165-CEH-JSS

TAMPA ELECTRIC COMPANY

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Roger B. Handberg, United States Attorney for the Middle District of Florida, and Todd Kim, Assistant Attorney General for the United States Department of Justice, Environment and Natural Resources Division, and the defendant, Tampa Electric Company, and the attorneys for the defendant, A. Brian Albritton, Esq. and Michael S. Hooker, Esq., mutually agree as follows:

### A.   Particularized Terms

1.   Count Pleading To

The defendant shall enter a plea of guilty to Count One of the Information. Count One charges the defendant with willful violation of an Occupational Safety and Health Administration (OSHA) standard causing death, in violation of 29 U.S.C. § 666(e).

2.   Maximum Penalties

Count One is a misdemeanor and carries a maximum sentence of not more than six months of imprisonment, a fine of $500,000, and a special assessment of $50. With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offense, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense, or if applicable, to the community, as set forth below.

3.    Elements of the Offense

The defendant acknowledges understanding the nature and elements of the offense with which defendant has been charged and to which defendant is pleading guilty. The elements of Count One are:

> First:    the defendant was an "employer" within the meaning of 29 U.S.C. § 652(5);
>
> Second:    the defendant violated an OSHA standard or regulation promulgated pursuant to 29 U.S.C. § 655;
>
> Third:    the violation was willful; and
>
> Fourth:    the violation caused death to any "employee" within the meaning of 29 U.S.C. § 652(6).

4.    No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida and United States Department of Justice, Environment and Natural Resources Division (collectively, the "United States") agree not to charge defendant with committing any other federal criminal offenses known to

Defendant's Initials _[initials]_                    2

the United States at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

5.   Restitution to Victims of Offense of Conviction

The defendant acknowledges its obligation to make full restitution to the victims or their estates pursuant to 18 U.S.C. § 3663(a)(3). After the June 29, 2017, Incident described below, TECO negotiated with each of the victims' families and their attorneys and entered into confidential civil settlement agreements with the estates of all the victims killed in the explosion as well as others harmed by it. These civil settlements were based on the same acts as the predicate conduct at issue in this offense, and defendant is entitled to be credited for the payments it made to the victims. *United States v. Hairston*, 888 F.2d 1349, 1355 (11th Cir. 1989) (if civil action and settlement based on same predicate acts as the offense, settlement should be factor in forming restitution order and crediting civil payment to defendant). Once those credits are applied, based on available information, the United States agrees with the defendant that it has satisfied its restitution obligations.

6.   Corporate Defendant

The undersigned corporate officer or representative of the defendant hereby certifies that he is authorized by the defendant corporation to act on its behalf, to plead guilty to the charge alleged in the Information, and to enter into this plea agreement, and that a corporate resolution so empowering said officer or representative has been duly made and approved by said corporation. Said defendant corporation either

Defendant's Initials _____   3

has or, by the time of sentencing, will have adopted an effective program to prevent and detect violations of law, to include the attached Safety Compliance Plan, which program shall require the exercise of due diligence, requiring at a minimum that the corporation take the steps set forth in USSG § 8B2.1. The defendant corporation further agrees that such a program may be made a special condition of probation, should the Court determine that a sentence of probation is appropriate.

7.    Joint Sentencing Recommendation

The parties agree to recommend to the Court at sentencing the imposition of a fine in the amount of $500,000, and a term of probation of three years, including the following special conditions: (a) compliance with its restitution payment obligations, *if any*; and (b) compliance with the attached Safety Compliance Plan.

8.    Cooperation

The United States acknowledges that defendant has cooperated fully throughout the course of the investigation, including making its employees available for interview, facilitating a site visit to Big Bend Station, providing transcripts of relevant meetings and documents as needed, and making defendant's expert available for questions.

B.    **Standard Terms and Conditions**

1.    Restitution, Special Assessment, and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, shall order the defendant to make restitution to any victim of

the offense, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. To ensure that this obligation is satisfied, the defendant agrees to deliver a cashier's check, certified check or money order to the Clerk of the Court in the amount of $50, payable to "Clerk, U.S. District Court" within ten days of the change of plea hearing.

The defendant understands that this agreement imposes no limitation as to fine.

2.    Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count to which defendant pleads, to respond to comments made by the defendant or

Defendant's Initials _____    5

defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

3. Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

4. Defendant's Waiver of Right to Appeal the Sentence

Defendant's Initials _Dure_                6

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, except (a) the ground that the sentence exceeds the statutory maximum penalty; or (b) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from its waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

5.    Middle District of Florida/Environmental Crimes Section Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and the Environmental Crimes Section of the United States Department of Justice and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

6.    Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

7.    Voluntariness

Defendant's Initials _____        7

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and,

if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

8.   Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant hereby admits that the facts set forth below are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

## FACTS

At all times relevant to the Information, the following was true and correct:

**Background**

- Tampa Electric Company (TECO), a subsidiary of Emera Inc., operated multiple power plants in Florida, including Big Bend Station, located in Hillsborough County.

- Big Bend housed four large, coal-fired furnaces that were also equipped to run on natural gas (or "units"). When operating as coal fired furnaces, three of the four units generated a molten by-product known as "slag" (a fourth unit is of a different design and does not generate slag). During operation, coal was burned in the boiler, producing slag, which fell to the bottom of the boiler. The slag, which could reach 1000 degrees Fahrenheit, was then supposed to drain into either of two "slag tanks" connected to the bottom of each boiler.

- Slag tanks were large metal chambers, approximately 30 feet high and 20 feet wide, located directly beneath the boiler. Each of the boiler units that generated slag were equipped with two slag tanks, and the units were designed to operate safely if only one tank was in service. Slag tanks were designed to be filled with water. When molten slag hit the water, it would rapidly cool and harden, causing it to become brittle. The brittle slag accumulated in the lower portion of the slag tank, known as the "doghouse." There, the slag was pulverized and ejected.

- The doghouse had both an "outer door" and an "inner gate." The outer door was about chest-high and was the access point into the doghouse, through which the bottom of the slag tank could be accessed. The doghouse gate was a heavy, pneumatic door connecting the body of the slag tank to the doghouse.

- Two different issues could occur that impacted the functionality of the slag tanks:

  1. The "tap hole" could become plugged. The tap hole was a roughly 24-inch round opening that connected the bottom of the boiler to the top of each slag tank (also known as the "neck" of the slag tank). Slag was supposed to drain steadily through the tap hole into the tank below, a process known as "tapping." However, due to various factors, the hole could become plugged, causing slag to accumulate on the bottom of the boiler, rather than dripping into the slag tank.

  2. The slag entering the slag tank, rather than shattering into small brittle pieces, could instead form large boulders, which settled at the bottom of the tank, or within the doghouse itself. Such boulders were difficult to get out and caused additional slag (which could not reach the doghouse) to accumulate in the slag tank. If such a condition persisted, the tank would become entirely full of slag.

- Evidence that a tap hole was plugged could come from visual inspection of the tap hole through observation ports on the side of the slag tank or from monitoring the temperature inside the slag tank vent line. Hot slag dripping into the slag tank would increase the temperature inside the tank, raising the temperature in the vent line.

- Historically, different methods were used to open a plugged tap hole, including "poke rods," oxygen torches, and jackhammers. Industrial, high-pressure water blasters were used intermittently throughout the utility industry since the 1980s, and exclusively at TECO's Big Bend Station after 2011. To clear the tap hole, the water blaster was inserted through small port holes in the upper "neck" of the slag tank. These holes were the designated entry point for any work on a tap hole while the slag tank was on-line. Because the port holes were angled upward towards the tap, they provided a means of both visually inspecting the tap hole and of aiming the water blaster upwards towards the hardened slag blocking the tap hole. This high-pressure water stream frequently would loosen the hardened slag, and facilitate the resumption of slag flow through the tap hole.

- Since 2011, water blasting was never conducted by TECO personnel at Big Bend, but rather only by Contractor A.

- Two primary methods, including water blasting, were used at Big Bend Station to clear boulders from the bottom of the slag tank. The first option performed only by Big Bend personnel was to try to dislodge boulders by "dumping the

tank." This meant filling the entire slag tank with water and then opening both the doghouse door and the gate and letting the tank's contents spill onto the floor in front of the slag tank. If that did not work, TECO could call in Contractor A to perform water blasting. Using water blasters to clear boulders at the bottom of the slag tank involved aiming the water blaster through the doghouse door and doghouse gate in order to break up or dislodge any boulders blocking the slag tank.

### *Development of STWB Procedure*

- In June 1997, TECO employees working at Bayside Power Station (another TECO facility of similar design to Big Bend, formerly known as Gannon Station) intentionally "froze" the tap hole (i.e. sprayed it with water to create a plug or blockage), so that workers could perform maintenance below without worrying about dripping slag. The plug fell out of the tap hole unexpectedly, causing "a rapid release of boiler gas and slag." Four workers who had been performing maintenance near the doghouse were injured.

- Following the June 1997 Bayside/Gannon incident, TECO formed a task force to "review all slag tank work practices involving activities while the boiler is on line." According to TECO, "it is important to learn from what happened."

- In September 1997, TECO created a "checklist" describing the "conditions, equipment, or participants...required to safely perform" each of five tasks: lancing the tap hole, removing buildup in the neck area, removing buildup in the

tank, removing gate obstructions, and performing maintenance below the gate. The list requires, inter alia, when either removing gate obstructions or performing maintenance below the gate that the furnace be brought to the minimum possible load. It also cautions that each task "needs to be considered separately and safe procedures used accordingly."

- In the summer of 2011, TECO decided to seal up the "poke holes" on the neck of the slag tanks at Big Bend, in part due to a concern that hot slag might fall through the angled port holes while workers were accessing the holes with water blasters. After these upper port holes were sealed off, the only way to attempt to clear a plugged tap hole was to slightly lower the water level in the slag tank, and insert a water blasting rod through another viewing port located on the side of the slag tank and direct it upwards towards the tap hole.

- Around this time, TECO employees started drafting the Slag Tank Water Blasting Procedure. TECO's Slag Tank Water Blasting Procedure (STWB Procedure) was developed by several employees over the course of several months in 2011.

- On October 1, 2011, a TECO employee (Employee A) and a Contractor A employee (Victim 1) were testing the use of this new procedure on a plugged tap hole on slag tank 2A when the plug abruptly fell out, resulting in the rapid release of steam and hot gasses, causing injury to Employee A. Employee A's supervisor, a TECO Supervisory Plant Operator (SPO), suspected that the

workmen had not kept enough water in the tank, such that when the plug fell and the contents of the furnace entered the tank, it caused the water in the water seal connecting the boiler and slag tank to flash to steam.

- In response to the foregoing incident, the TECO Safety Coordinator (Employee B) conducted a meeting two days later regarding "slag tap clearing." The meeting was recorded in the Safety Coordinator's notes, which documented the discussion of the need to hold a tailboard meeting with the contractor, to put a "seasoned BTO [boiler-turbine operator] in charge," to "secure area with warning tape, "to "clear [an] established escape path," and to "stay clear." [Note: a "tailboard" is a pre-job meeting also known as a "job briefing."]

- The draft procedure was amended between October 5 and October 27, 2011, to incorporate lessons learned from the above-referenced October 1, 2011, event. Specifically, the following language was added to the procedure: "any personnel not involved with opening the tap hole need to stay back out of egress route," and "keep tank water near lower inspection level."

- On February 2, 2012, a safety meeting was held between TECO and Contractor A. This meeting was attended by Big Bend's Manager of Operations, who supervised all SPOs at Big Bend Station, as well as a TECO SPO directly involved in drafting the new STWB Procedure, a TECO operator also involved in drafting the procedure, three TECO engineers with extensive

experience involving slag tank operations, TECO's Big Bend Safety Coordinator, and the CEO and another representative of Contractor A that performed the water blasting procedure. The meeting was memorialized in notes taken by TECO's Safety Coordinator, which include the following: "Process is successful and want to talk about our best practice. Anything we want to change or improve" "Others doing this in industry? No unique," "[Contractor A] has written procedure and trains their people," "TECO fab a shield to minimize [the] exposure – install poke hole access," "SWP [safe work practices] slag tanks no door opening," "main concern is the access to observe and clear."

- The STWB Procedure was not amended as a result of this meeting.

### *TECO's Slag Tank Water Blasting Procedure*

- The TECO STWB Procedure had three basic parts: (1) introductory paragraph written by a TECO engineer, (2) procedures for clearing a plugged tap hole, and (3) procedures for clearing boulders from the bottom of the slag tank.

- The introductory paragraph stated "If your last slag tap closes and the water blasters are not able to arrive on site and open the tap within 2 hours, you will need to come to 2 mill operation to try and minimize the molten slag build up in the boiler. This should help prevent an excessive amount of slag tap going into the slag tank when the tap is opened up. If the last slag tap closes and you are unable to reopen within 6 to 8 hour you will need to take the unit off."

- The portion of the procedure governing the clearing of tap holes required, among other things:

    o A "tailboard meeting with all participating team members";

    o Use of a gas analyzer "to ensure there is a safe atmosphere to work in"

    o Use of "all appropriate PPE [personal protective equipment]";

    o The area below being caution taped off;

    o Removal of debris and ensuring "room...to back out of harm's way as needed";

    o "Communication with the Control Center Operator in case there is a boiler upset, for example the furnace pressure going positive";

    o Ceasing soot blowing.

- The final portion of the procedure governed water blasting where "buildup is in the slag tank blocking the dog house door," and it required, among other things:

    o Caution taping the area;

    o Use of "all proper PPE";

    o Holding a "tailboard meeting with all participating team members";

    o Removal of debris and ensuring "room...to back out of harm's way as needed";

    o "Communication with the Control Center Operator in case there is a boiler upset, for example the furnace pressure going positive";

    o Ceasing soot blowing;

Defendant's Initials                     16

- o After opening the doghouse door and gate, "the water blasters can proceed to clearing out the blockage. They shall take extreme care to always stand off to the side of the doghouse opening, so that they can get out of the way when the blockage is cleared."

- Although the STWB Procedure was not made a part of TECO Safe Work Practices Manual, the STWB was emailed and/or provided to one or more of the Big Bend SPOs in 2011. A physical copy was not stored on-site at Big Bend, nor was it easy to locate on the Company's intranet, although it was available within the Company's computer system on its H Drive.

- The STWB Procedure also was not the subject of any formalized training provided to operators. TECO avers that the Procedure was encompassed within on-the-job training; however, written records showing the extent of such on-the-job training were not kept. Employee D, the SPO on duty at the time of the incident, recalled that "I've never provided any training on the 'Slag Tank Water Blasting Procedure' to TECO employees or [Contractor A] employees."

- After the incident on June 29, 2017, described below, OSHA interviewed nine TECO operators who worked on the day of the incident. All but one reported that they had never seen the STWB Procedure before and the other reported having seen the procedure a single time.

Defendant's Initials _____ 17

- Water blasting the tap hole had been performed at least 100 times since the creation of the STWB Procedure. Water blasting through the doghouse into the slag tank had also been performed before, but it was done less frequently.

### Incident on June 29, 2017

- On June 29, 2017, Slag tank 2A was the only slag tank servicing Unit 2 at Big Bend. Slag tank 2B had clogged weeks earlier and had remained closed. Unit 2 could run indefinitely using just one open slag tank.

- The temperature in the slag tank vent line began dropping at about 3:00 a.m., and efforts were made to clear the tap hole by making adjustments to the furnace and by dumping the tank. These efforts continued throughout the day. There was some temperature fluctuation within the slag tank vent line throughout the day, which the SPO on duty at the time (Employee D) determined "could be attributed to partial slag tap openings." Employee D recalled that they "spent a whole shift trying to open this tap."

- With the exception of one brief period of time at approximately 6:30 a.m., the temperature reading in the slag tank vent line never exceeded 300° F. Employee D recalled a meeting at 6:00 a.m. where the question "do we have an issue of pluggage" was discussed. There was some uncertainty about the state of the tap hole due to fluctuations in the temperature data. Further complicating the matter

was the fact that the glass on the observation port was obscured by soot, making visual observation of the tap hole impossible.

- A TECO slag tank operational document titled "Tap Hole Verification/Slag Tank Vents" stated "If slag tapping can't be visually verified, use the following guideline: "the temperature should be above 300 F. A hot vent line indicates an open tap hole. If the vent temperature is below 300 F, adjust the vent isolation valve to maintain temperature above 300 F. If the vent line temperature is low and cannot be raised, there is a good possibility that the tap hole has closed or that the vent is plugged." Some operators later reported that, based on their experience, temperatures of less than 300° were not necessarily an indication of a tap hole pluggage. Employee D stated that he was "not sure where the vent line temperature should be with that unit if it is tapping normally...I usually run in 500-600 F for a full open tap. I would be concerned about a 150 F vent line."

- Although the STWB Procedure directed that the number of coal mills be reduced to 2 if the tap could not be opened within two hours, the number of coal mills feeding the boiler were increased to 3 at 6:30 a.m. and were never decreased. [1]

- The STWB Procedure required that the unit be brought off line if the tap hole is not reopened within 6 to 8 hours of closing.

---

[1] Temperatures reached the mid-90s in the Tampa area on June 29, 2017.

- Employee D recalled, "In the afternoon on incident day I went to my boss and told him we dumped the tank all day, we believe the tap to be closed, do we want to go run on gas or call [Contractor A] in to clear it."

- At approximately 3:00 p.m. (over 12 hours after the vent temperatures first fell below 300 F, and 9 hours after the vent temperatures fell below 300 F for the last time), the TECO Manager of Operations (Employee C) decided after discussions with the Employee D, to call Contractor A to come to the plant and attempt to open the tap hole by use of water blasting.

- Employee D was told of a simultaneous blockage at both the boiler neck and in the slag tank by Victim 2. Employee D looked for the STWB Procedure before commencing water blasting, but was unable to find it. Employee E, another SPO, also looked for the procedure, but was unable to find it. Nonetheless, TECO personnel decided to continue with water blasting.

- Although the STWB Procedure had steps to address both a blockage at the upper tap hole, and procedures for a blockage within the slag tank, it did not address how to respond to a simultaneous or "double" blockage at both the upper tap hole and lower in the slag tank. The simultaneous blockage of the tap and slag tank posed an increased hazard to those working on the slag tank, particularly after the doghouse door and gate were opened.

- At approximately 3:30 p.m., Contractor A arrived on site and began to set up for water blasting. The STWB Procedure required a tailboard meeting (i.e. job

briefing) with all members participating in the work. Such a tailboard did not occur. Although there are indications that the TECO operator on duty, Victim 2, did speak briefly with a representative from Contractor A about the plan of action, these discussions did not include all participating members, nor did they cover all the necessary topics. In particular, he did not discuss the procedures for the work, as the STWB Procedure could not be located.

- A tailboard meeting of all members, including Contractor A, the Big Bend Operators and SPO, and any others participating in the work would have helped TECO to recognize that they were dealing with an uncommon simultaneous blockage that posed a unique danger and that should have prompted TECO to take appropriate measures to forego the work and shut down the unit instead.

- A tailboard meeting also would have required the review of the STWB procedures, and compliance with the requirements of those procedures.

- Instead, workers, including Victims 1 and 3, began setting up to start water blasting at the slag tank sometime shortly after 3:00 p.m.

- At 3:32 p.m., the doghouse gate (which was equipped with an open/close sensor) was opened and closed repeatedly in quick succession, possibly indicating difficulty in getting the gate to close fully or an attempt to crush a boulder

blocking the gate opening by using the downward force of the gate. At 3:36, the gate was opened and remained open for the duration.

- At approximately the same time, Contractor B (an industrial services contractor) was called to remove debris from the tank being dumped. Although the STWB Procedure required that the area be restricted with caution tape, and that the area be kept clear once the tank was opened, Contractor B employees were in the area cleaning up slag during the incident.

- Victim 2 (a TECO employee) told Contractor A employees that the slag tank was "clogged all the way to the top" and to start at the bottom.

- In contravention of the STWB Procedure, no air monitor was utilized prior to water blasting. Hence any elevated levels of carbon monoxide or other gasses would not have been detected.

- In contravention of the STWB Procedure, the soot blowers were not turned off prior to water blasting. Soot blowers were to be turned off to reduce the likelihood that debris in the furnace might fall and strike the tap hole, causing it to rupture unexpectedly. It is unknown whether soot blowers played any role in causing the incident, although there is evidence that the soot blowers were activated just prior to the incident.

- Victim 1, a Contractor A employee, began water blasting into the open doghouse door, through the doghouse, past the doghouse gate, and into the slag tank.

- Although the STWB Procedure stated that workers "always stand off to the side of the doghouse opening, so that they can get out of the way when the blockage is cleared," Contractor A employees regularly set up directly in front of the open doghouse because this positioning allowed them to more easily aim their water blasters through the doghouse and into the slag tank.

- Victim 1 had been operating the blasting gun at the bottom of the tank for several minutes at the time of the explosion. Shortly before the incident, Victims 2 and 3 peered into the doghouse door looking up into the slag tank, perhaps to assess the state of the boulders in the tank.

- At about that time, an explosion in the slag tank ensued that violently expelled steam and slag out of the open doghouse door. Witnesses described seeing "black and hot rocks" and that it "looked like a volcano and a jet dragster. It was a fireball with molten slag coming out. It was liquid slag/lava on fire."

- Five individuals were killed in the explosion: TECO employee Victim 2; Contractor A employees Victims 1 and 3; and Contractor B employees Victims 4 and 5.

- After the incident, efforts were made to locate the STWB Procedure. Eventually, after about an hour of looking, Employee E was able to locate the procedures in TECO digital "library."

- Employee C, TECO Manager of Operations, subsequently stated of the STWB Procedure that they "normally don't follow [them] to the letter. I view them as a guide."

9.    <u>Entire Agreement</u>

This Plea Agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

10.    Certification

The defendant and defendant's counsel certify that this plea agreement has

been read in its entirety by (or has been read to) the defendant and that defendant fully

understands its terms.

DATED this ___4th___ day of May, 2022.

ROGER B. HANDBERG
United States Attorney

TODD KIM
Assistant Attorney General

Adam Cullman
Trial Attorney
Environmental Crimes Section
U.S. Department of Justice

Tampa Electric Company
Defendant

A. Brian Albritton, Esq.
Phelps Dunbar LLP
Attorney for Tampa Electric Company

Rachelle DesVaux Bedke
Assistant United States Attorney
Chief, Economic Crimes Section

Michael S. Hooker, Esq.
Phelps Dunbar LLP
Attorney for Tampa Electric Company

Defendant's Initials _____

25

# SAFETY COMPLIANCE PLAN
## United States v. Tampa Electric Company

## I.  Background and Scope

The following standards and requirements for a SAFETY COMPLIANCE PLAN ("SCP") have been prepared pursuant to the Plea Agreement between Tampa Electric Company ("TECO") and the United States filed in the United States District Court for the Middle District of Florida. TECO shall comply with the SCP during its term of Probation.  Compliance with all of the standards and requirements of the SCP is an essential term of the Plea Agreement and a condition of Probation.

This SCP includes various provisions to ensure that the TECO Big Bend Power Station located at 603 Big Bend Road, Apollo Beach, FL 33572 (the "Facility") complies with applicable requirements set forth by the Occupational Safety and Health Act ("OSH Act") and the standards and regulations promulgated pursuant to the OSH Act.

TECO maintains both a company-wide, comprehensive Safety Management System and a Contractor Safety Management Program, and periodically audits facets of both programs.  The SCP is not intended to replace those safety compliance programs already developed and implemented by TECO at the Facility.  Rather, the purpose of this SCP is to ensure the following:

   (i)     that the Facility follows the applicable OSH Act regulations and requirements highlighted herein, especially 29 C.F.R. § 1910.269(c) that applies to "job briefings";

   (ii)    that, if not otherwise already provided, TECO shall create or continue to maintain some form of receptacle of the Facility's written work procedures, critical task procedures, and safe work practices that are readily and easily available to Facility employees and for which they are trained to use;

   (iii)   that if needed, training, inspections, reviews, and audits of the Facility related to meeting the requirements of 29 C.F.R. § 1910.269(c) are increased or improved;

(iv)     that TECO's Safety Management System as applied to the Facility is audited annually to evaluate its effectiveness in creating a safe working environment and preventing injuries at the Facility and to determine if there are any gaps in its coverage; and

(v)     that periodic reports are provided to the Occupational Safety and Health Administration ("OSHA"), the United States Probation Office for the Middle District of Florida, the United States Attorney's Office for the Middle District of Florida, and the Environmental Crimes Section of the United States Department of Justice (collectively hereinafter "the United States").

## II.     Safety Compliance Manager

A. With the approval of the United States, TECO has designated its current Vice-President of Safety, C.W., as the Safety Compliance Manager (hereinafter "SCM") for this SCP.

B. The SCM shall be responsible for the following:

(i)     coordinating with the Third-Party Auditor (hereinafter "TPA"), as more fully described below;

(ii)     developing and implementing all of the procedures and systems required herein;

(iii)     establishing and implementing training programs if needed;

(iv)     ensuring that inspections, reviews, and audits are carried out as required; and

(v)     ensuring that all documents are properly maintained and that reports are made on a timely basis.

PD.37383780.3

C. Although the SCM remains responsible, the SCM may assign or delegate some of the duties and tasks herein, provided the SCM exercises oversight to any assignee or delegate. All reports required under this SCP shall be prepared or reviewed by the SCM. The SCM must certify under the penalty of perjury that, to the best of his or her knowledge, the information contained in the reports is true and correct.

D. In the event the SCM position becomes vacant, TECO will move promptly to fill the SCM position with an individual possessing a significant safety compliance background, who is thoroughly familiar with the requirements of this SCP, and who is knowledgeable about the OSH Act regulations and requirements applicable to the Facility.

E. Within 60 days of sentencing, TECO shall provide a copy of the SCP to the Facility's management team and to the labor union representing employees at the Facility ("Union"), shall include instruction on its existence as part of any orientation to newly hired Facility employees, and shall include a prominent notice and "link" to the plan on the initial page of TECO's Safety Management System intranet site that is available to all TECO employees. The SCP shall remain accessible to employees and the Union during the Probation period.

F. TECO shall ensure that all employees cooperate fully with the SCM, the TPA, and the United States in carrying out the provisions set forth in this SCP.

G. The SCM shall be authorized to access all records and personnel for the purpose of ensuring compliance with this SCP. The SCM shall be authorized to implement all requirements of this SCP and shall ensure that audits are carried out as required, all documents are properly maintained, and reports are made on a timely basis to the TPA and made available upon request by the United States.

H. If the SCM believes TECO is hindering or interfering with the SCM's efforts to implement this SCP or refusing to implement measures recommended by the SCM such as to render TECO in non-compliance with applicable OSHA standards and regulations, the SCM shall inform the TPA.

PD.37383780.3

I. TECO agrees not to retaliate against the SCM for carrying out his/her duties to implement this SCP.

## III. Third Party Auditor

A. During the period of probation, TECO will retain a qualified TPA. TECO provided information regarding a candidate for the TPA position (FDRsafety, LLC) to the United States, and the United States agrees that this candidate is qualified. All work performed by the TPA and its agents must be certified as being accurate and truthful. The certification shall be made with the understanding that any false information knowingly submitted is subject to prosecution under 18 U.S.C. § 1001.

B. Qualifications. In the event the present designee cannot continue to serve as TPA, a new nominee for TPA shall be provided to the United States within 60 days. Qualified candidates for the TPA shall include individuals or firms that have staff capable of applying the most current OSHA standards and have the following experience, expertise, and capabilities:

    (i)      expertise and competence in the regulatory programs under the OSH Act;

    (ii)     experience in performing safety audits in industrial or manufacturing environments; and

    (iii)    sufficient expertise and competence to assess whether the Facility has adequate policies, procedures, and equipment in place to ensure compliance with this SCP and to ensure regulatory compliance, correct non-compliance, and prevent future noncompliance.

C. During the term of Probation, the TPA shall not directly own any stock in TECO; must have no other ongoing contractual or business relationship, other than that of the TPA, with TECO; and may not seek or serve in other capacities with TECO, unless first disclosed to the United States and the Court, and

PD.37383780.3

unless expressly approved by the United States. The TPA must exercise independent judgment and ensure that the objectives set forth in this SCP are met. TECO and the TPA shall notify the United States if any contractual relationships or proposed contractual relationships between TECO and the TPA arise during the term of probation.

D. The TPA shall function independently of TECO but may communicate with TECO about the substance of its work. The TPA may consult with but shall not receive or request approval in any form from any TECO employee regarding the development, clearance, or evaluation of any document, report, or communication of any kind, whether draft or final, required by this SCP.

## IV. Policies and Procedures

A. Within 90 days of sentencing, the SCM shall:

(i) In consultation with the Union/Management team that annually reviews the Facility's safe work practices, evaluate the TECO Safe Work Practices Manual to ensure it clearly and adequately addresses the requirements for and application of 29 C.F.R. § 1910.269(c) relating to "job briefings," and makes any changes that are warranted.

a) In adherence with 29 C.F.R. § 1910.269(c), TECO's job briefings shall address:

1) the hazards associated with a particular job and the relevant equipment,

2) the work procedures that may be involved,

3) any special precautions necessary to complete the work safely,

4) the hazardous energy control or lock out tag out (LOTO) procedures that must be followed, and

PD.37383780.3

5) any personal protective equipment required for the job.

b) Any employee who is required to work alone shall participate in a job briefing with his or her team at the beginning of the shift. If he/she is unable to participate in the team job briefing, the employee will meet individually with his or her supervisor, senior operator, or crew leader to perform the job briefing.

(ii) Confirm that Facility employees and (where applicable) contractors have ready access to the written procedures maintained by TECO that set out the requirements for conducting job briefings pursuant to 29 C.F.R. § 1910.269(c).

(iii) Ensure that the Facility has documented safe work practices requiring employees to perform job briefings prior to beginning work covered by 29 C.F.R. § 1910.269(c).

(iv) Confirm that TECO continues to maintain its SharePoint intranet site where the Facility's written work procedures, critical task procedures, and Safe Work Practices Manual (with live links to the procedures or programs cited therein) are stored; confirm that the SharePoint site is readily accessible to and easily searchable by employees; and confirm that the site is updated to reflect any changes to the written work procedures, critical task procedures, and Safe Work Practices Manual.

(v) Ensure each year that TECO provides all Facility employees with a yearly edition of the Safe Work Practices Manual in either a written booklet form, safety "app," or both, and that the Safe Work Practice Manual is reviewed and updated as needed.

B. Within 30 days of hiring the TPA, the SCM shall submit TECO's Safe Work Practices for job briefings to the TPA. If the TPA determines that TECO's Safe Work Practices job briefing requirements either fail to comply with the requirements of the SCP or with the provisions in 29 C.F.R. § 1910.269(c), within 60 days of TECO's receipt of the TPA's written determination, the SCM shall

PD.37383780.3

make the necessary additions and/or revisions and resubmit the revised TECO's Safe Work Practices to the TPA.

## V. Training

A. Within 120 days of sentencing, the SCM shall ensure that all Facility employees have been provided with access to copies of and trained on all of the TECO Safe Work Practices that apply to "job briefings" relevant to their job or the performance of their duties. To the extent employees have previously been fully trained on the foregoing, no re-training shall be required.

B. Within 135 days of sentencing, the SCM shall ensure that all contractors performing work at TECO have been provided with access to copies of TECO's procedures relating to the requirement that contractors perform job briefings pursuant to TECO's Safe Work Practices and 29 C.F.R § 1910.269(c) and obtain certifications from the contractor showing that contractors have trained their personnel on the foregoing procedures.

C. Within 120 days of sentencing, the SCM shall ensure that the Facility's employees have undergone training on how to access and search for written job procedures, critical task procedures, and the Safe Work Practices Manual on TECO's SharePoint site and that such training includes notifying Facility employees of any substantive changes to those procedures and to the Safe Work Practices Manual that have occurred during the year prior to the corresponding training unless said training has already been provided. The SCM shall ensure that such training of the Facility's employees takes place annually thereafter.

D. The SCM or his designee shall provide records of the training described in this section to the TPA on a quarterly basis and shall make such records available to the United States upon request.

## VI. Compliance Inspections

A. Starting no later than 120 days after sentencing, for at least one hour per week, the SCM or his or her delegate shall perform Compliance Inspections of work

PD.37383780.3

at the Facility that requires a job briefing pursuant to 29 C.FR. § 1910.269(c). The inspection shall include an evaluation of compliance with any Safe Work Practices that employees must follow during the work. The SCM shall document all violations of the job briefing procedures or other Safe Work Practices observed during the Compliance Inspection.

B. By no later than 15 days after the end of a calendar month, the SCM shall prepare a Compliance Report describing all violations of TECO's Safe Work Practices observed during the inspections conducted pursuant to the previous paragraph of this Agreement. The Compliance Report shall describe all violations discovered during Compliance Inspections or in any other manner, including a description of the disciplinary action taken in response to those violations.

C. The SCM may delegate the performance of such Compliance Inspections, and/or the preparation of the Compliance Report to another individual, upon approval by the TPA. However, all Compliance Reports must be signed by the SCM.

D. TECO maintains an existing comprehensive safety compliance plan known as its Safety Management System, which in turn, has specific applications to the Facility. Within 120 days after sentencing, the TPA shall conduct a review and audit of the Facility's overall Safety Management System to evaluate its effectiveness in creating a safe working environment and preventing injuries at the Facility and to determine if there are any gaps in the coverage of the Facility's overall Safety Management System. The TPA shall conduct this same audit on an annual basis thereafter.

## VII. Mechanism for Employees to Report Safety Concerns

A. Within 60 days of the entry of the plea agreement, the SCM shall establish, publicize to all employees, and post in a conspicuous place in the Facility or on the Company's intranet, a mechanism – such as a "hot line" – by which employees may report (anonymously if the employee so desires) any safety concerns, including concerns that the Safe Work Practices are not being

PD.37383780.3

followed. Employees hired after this date shall be provided with information about this mechanism as part of their orientation. To the extent TECO has previously instituted and maintains a confidential reporting mechanism meeting the requirements in this paragraph and acceptable to the TPA, the SCM shall not be required to take any further steps.

B. TECO shall ensure that any "hot line" safety complaints about the Facility are timely reported to the SCM. The SCM shall review, investigate, and document in a timely fashion reports of Facility safety concerns received from employees and shall initiate, monitor, and document all actions taken as a result of such reports.

C. The SCM shall maintain records of employee reports and the actions taken as a result of such reports, shall provide these records to the TPA on a quarterly basis, and shall make these reports available to the United States upon request.

## VIII. TPA Audit Reports

A. No later than 120 days after the TPA is hired, and on an annual basis thereafter, the TPA shall prepare and submit to the United States an Audit Report that addresses TECO's compliance with this SCP, including but not limited to the following:

(i)     Whether TECO's Safe Work Practices include the requirements set out in 29 C.FR. § 1910.269(c);

(ii)    Whether TECO is conducting employee training at the Facility on its Safe Work Practices and the application of 29 C.FR. § 1910.269(c);

(iii)   Whether the SCM  is carrying out Compliance Inspections and completing Compliance Reports in compliance with Section VI of this SCP;

(iv)    The results of the TPA's annual review and audit of the Facility's overall Safety Management System as to the program's effectiveness

PD.37383780.3

in creating a safe working environment and preventing injuries at the Facility and report whether the audit identified any gaps in the coverage of the Facility's overall Safety Management System.

(v)     Any employee reports of Facility safety concerns that the TPA does not believe have been adequately addressed in accordance with Section VII of this SCP; and

(vi)    Any violation of TECO's Safe Work Practices that is discovered by the TPA or brought to the TPA's attention by the SCM or through a report of an employee concern, that has not been remedied by TECO.

B. The TPA shall provide TECO, OSHA, and the United States Probation Office for the Middle District of Florida with a copy of all Audit Reports at the same time that they are submitted to the United States.

## IX.   Enhanced OSHA Oversight

A. If, based on any information provided to OSHA in Audit Reports, through information from whistleblowers, or from any other source, OSHA determines there are reasonable grounds to believe that a violation of a safety or health standard exists that threatens physical harm, or that an imminent danger exits, at the Facility:

(i)     TECO shall allow OSHA personnel to inspect the Facility without a warrant and without advance notice, and understands that OSHA may issue citations or take other lawful enforcement actions following  such inspections;

(ii)    OSHA will have access to and the right to require production of documents in the possession or control of TECO, subject to limitations of privilege, which OSHA reasonably requires to determine whether TECO is in compliance with the OSH Act; and

PD.37383780.3

(iii)    OSHA will have the authority to interview any agent or employee of TECO concerning any matter related to compliance with the OSH Act, subject to limitations of privilege. If requested by the agent or employee, the interview shall be private.

PD.37383780.3